UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Kaitlin Hudson


     v.                            Civil No. 11-cv-278-JD
                                     Opinion No. 2011 DNH 160

Dr. Michael J. O'Connell's
Pain Care Center, Inc. and
Dr. Michael J. O'Connell


O R D E R


    Kaitlin Hudson brings state and federal claims against her
former employer, Dr. Michael J. O'Connell's Pain Care Center,
Inc., and Dr. Michael J. O'Connell, arising from her relationship
with O'Connell and the conditions of her employment at the Pain
Care Center.  The defendants move to dismiss her complaint,
arguing that Hudson has not stated a claim.  Hudson objects to
the motion.


Standard of Review

    When considering a motion to dismiss under Federal Rule of
Civil Procedure 12(b)(6), the court must determine whether the
facts alleged, when taken as true and in the light most favorable
to the plaintiff, state a claim on which relief can be granted.
Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009).
Under the notice pleading standard of Federal Rule of Civil

Procedure 8(a)(2), a plaintiff need provide only a short and plain statement that provides enough facts "'to raise a right to relief above the speculative level . . . .'" <u>Ocasio-Hernandez v. Fortuno-Burset</u>, 640 F.3d 1, 12 (1st Cir. 2011) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  The court must separate the factual allegations from any legal conclusions and decide whether the factual allegations, taken as true, state a plausible claim for relief.  <u>Ocasio-Hernandez</u>, 640 F.3d at 10-11 (applying <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949-50 (2009)).

<u>Background</u>[1]

At the time of the events in question, Michael J. O'Connell was a licensed physician.  He owned and was employed by Dr. Michael J. O'Connell's Pain Care Center, Inc. ("Center").  The Center hired Hudson as an office assistant in July of 2008.  She became a patient of O'Connell at the Center after she was hired.

In December of 2008, O'Connell began a sexual relationship with Hudson, and Hudson moved into O'Connell's home.  O'Connell was also Hudson's treating physician and prescribed medications for her.  O'Connell threatened Hudson that he would terminate her

---

[1]The background is taken from Hudson's "Second Amended Complaint" (document no. 9) construed under the Rule 12(b)(6) standard.

employment if she did not meet his personal demands, including engaging in sex.  O'Connell also told Hudson that if she left the house, went on Facebook, talked about him to other people, or did anything else that displeased him, he would fire her.  When Hudson wanted to end the relationship, O'Connell told her that he would fire her if she did not continue their relationship and also threatened to "kick her out of the house" and to file false reports about her with the police.  As a recovering drug user, Hudson was not emotionally or financially able to live without her job.

In October of 2009, Hudson began to suspect that O'Connell was involved with a woman, who had lived at O'Connell's beach house.  O'Connell previously had told Hudson that the woman's husband had herpes, which was so severe that the husband had been hospitalized.  When Hudson suspected that O'Connell was involved with the woman, she underwent a herpes test, which yielded positive results.  Hudson had never had herpes before her relationship with O'Connell.

After their sexual relationship ended, O'Connell did not allow Hudson to work at the Center on Saturday, as other employees did, to make extra money.  Instead, O'Connell told Hudson she could clean his house and mow his yard for extra money.  Hudson did those jobs in order to maintain her

employment.  As he had before and during their sexual relationship, O'Connell continued to subject Hudson to sexually suggestive behavior at work, such as pinching her buttocks, pinching other parts of her body while saying she looked like she was gaining weight, and telling her she was looking good.

Hudson eventually refused to continue to work at O'Connell's house, and the Center put her on probation, ostensibly because of events that had occurred a year earlier.  At a work meeting, Hudson raised a concern that male doctors were favoring female patients over male patients.  O'Connell threatened to fire her and told her "just shut the f**k up" and "suck it up or leave." The Center changed Hudson's job from administrative assistant to medical assistant, a position that Hudson had not been trained to do.  The Center assigned her menial tasks in her new position and then transferred her to another office to work with a doctor that the Center staff believed was difficult.

As her treating physician, O'Connell provided Hudson with medication for herpes.  In December of 2010, other Center employees began to make remarks to Hudson about her herpes diagnosis.  Hudson had not mentioned herpes to anyone, other than O'Connell, at the Center.  When she checked her medical file on the Center computer, she discovered that it was not marked as

confidential.  As a result, her records were available to all
Center employees.

On December 6, 2010, Hudson reported the problem with her
medical records to the Human Resources department at the Center.
The department staff told Hudson to discuss the problem with
O'Connell.  Hudson called O'Connell and told him that other
employees had read her medical records and were discussing her
medical condition.  O'Connell responded that if Hudson "did not
stop talking to H.R. he would f***ing fire her."

During the call, O'Connell also said that someone had filed
an anonymous complaint against him with the New Hampshire Board
of Medicine.  He said that the complaint included information,
which was "right on," including that Hudson was married when she
started working at the Center and that she ended her marriage
when she began her relationship with O'Connell.  O'Connell
accused Hudson of filing the complaint and told her that she
would have to write to the Medical Board to say that the
complaint was not true or he would fire her.  O'Connell also said
that they would meet the next day to discuss the complaint.
Hudson was upset and left work after the call with O'Connell.  A
Human Resources employee contacted Hudson to check on her because
she had noticed how upset Hudson was when she left.

The next day, December 7, 2010, O'Connell met Hudson in a conference room.  O'Connell showed Hudson the complaint.  Hudson told O'Connell that she would not lie to the Board of Medicine. O'Connell responded that Hudson was going to ruin his life and cost 140 people their jobs.  Hudson was distraught and left work, using her accrued sick time to avoid coming to work.  She has not returned to work since that time.

Discussion

Hudson alleges claims against the Center of "constructive discharge/wrongful termination," sexual harassment, retaliation, quid pro quo harassment, and hostile work environment.  She alleges claims of battery, negligent infliction of emotional distress, and negligence against O'Connell.  She also alleges invasion of privacy and intentional infliction of emotional distress against the Center and O'Connell.  The defendants move to dismiss all of the claims.

I.  Employment Claims

Hudson alleges a constructive discharge/wrongful termination claim in Count I under New Hampshire law.  In Counts VI, VII, VIII, and IX, Hudson alleges sexual harassment, retaliation, quid pro quo harassment, and hostile work environment.

A.   <u>Constructive Discharge/Wrongful Termination - Count I</u>

New Hampshire recognizes a claim for wrongful termination when an employee alleges facts showing that "(1) [her] termination was motived by bad faith, retaliation or malice; and (2) that [she] was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn." <u>MacKenzie v. Linehan</u>, 158 N.H. 476, 480 (2009).  The termination of employment element of wrongful termination may be by constructive discharge, rather than an express termination.  <u>Lacasse v. Spaulding Youth Ctr.</u>, 154 N.H. 246, 248-49 (2006).  Constructive discharge occurs when "an employer renders an employee's working conditions so difficult and intolerable that a reasonable person would feel forced to resign."  <u>Id.</u> (internal quotation marks omitted). Minor abuse will not support constructive discharge, and instead, the employee must allege facts showing that the adverse working conditions were "'ongoing, repetitive, pervasive, and severe.'" <u>Id.</u> at 249 (quoting <u>Porter v. City of Manchester</u>, 151 N.H. 30, 42 (2004)).

The defendants move to dismiss Hudson's wrongful termination/constructive discharge claim on the ground that she has not alleged facts to support constructive discharge and,

therefore, cannot maintain her wrongful termination claim.[2]   In
support of the motion, the defendants parse through Hudson's
experiences, arguing that none was severe or pervasive enough to
constitute constructive discharge.  The defendants also argue
that because the sexual relationship with O'Connell ended months
before Hudson left, that conduct cannot be considered a basis for
constructive discharge.  Further, the defendants contend that
O'Connell's threats to fire her for talking to Human Resources
and if she refused to write the letter to the Medical Board were
insufficient to support constructive discharge.  Hudson contends
that she has alleged working conditions that were sufficiently
severe and pervasive to state her claim.

Hudson alleges that she was compelled to enter and continue
a sexual relationship with her boss, O'Connell, in order to keep
her job.  When that relationship ended, O'Connell would not allow
Hudson to work at the Center on Saturdays as other employees did
and instead told her she could clean his house and mow his yard
to earn extra money.  He also continued to engage in sexually
suggestive conduct toward her while she was working.  As a

---

[2]The defendants do not challenge the complaint with respect
to the elements of wrongful termination other than constructive
discharge, and therefore the court does not address the nexus
between Hudson's alleged constructive discharge and the elements
of wrongful termination.  See Cloutier v. Great Atl. & Pac. Tea
Co., Inc., 121 N.H. 915, 918 (1981).

patient of O'Connell's at the Center, Hudson was treated by him for herpes, and the Center failed to maintain the confidentiality of Hudson's medical records.  The lack of confidentiality caused her records to be seen by other staff members, and she was subjected to office gossip and comments about her medical issues. The Center reassigned Hudson to an undesirable job, and O'Connell berated Hudson at an office meeting.  O'Connell repeatedly threatened to fire Hudson if she did not comply with his wishes.

When Hudson complained to the Human Resources department about the breach of confidentiality of her records, she was referred to O'Connell.  O'Connell told her he would fire her if she complained again to the Human Resources department.  He also accused her of filing a complaint with the Medical Board, which he acknowledged was true, and required her to send a letter to the Board that the complaint was false.  He said he would fire her if she did not send the letter as directed.  She refused to send the letter and left work the same day.

New Hampshire cases examining constructive discharge claims have found a variety of conduct sufficient to support the claim. See Huard v. Town of Allenstown, 2011 WL 540766, at *3-*4 (D.N.H. Feb. 8, 2011) (discussing New Hampshire cases).  Taken as a whole and in the light most favorable to her, Hudson's allegations present a series of abusive, demeaning, and threatening actions

that extended over the entire period of her employment at the
Center.  As such, Hudson sufficiently alleges constructive
discharge to overcome the defendants' motion to dismiss.


     B.  <u>Sexual Harassment - Count VI</u>

 Hudson alleges a claim of sexual harassment under 42 U.S.C.
§ 2000e, et seq. ("Title VII"), and New Hampshire Revised
Statutes Annotated ("RSA") chapter 354-A.  The defendants move to
dismiss Hudson's sexual harassment claim on the grounds that her
allegations are conclusory and fail to state a claim.  Hudson did
not respond to the part of the defendants' motion that challenged
Count VI.  In the absence of a response, the court will assume
that Hudson concedes that Count VI should be dismissed.


     C.  <u>Retaliation - Count VII, Quid Pro Quo Harassment- Count</u>
        <u>VIII, Hostile Work Environment - Count IX</u>

    Although Hudson cites Title VII and RSA 354-A in support of
Count VI, she does not indicate in her complaint the legal basis
for her retaliation, quid pro quo harassment, and hostile work
environment claims.  Based on her objection to the defendants'
motion, it appears that she intended to bring her claims under
Title VII or RSA 354-A or both.  Because the New Hampshire
Supreme Court relies on Title VII cases to analyze claims under

RSA 354-A, the court will address the claims together using the Title VII standard.  See Madeja v. MPB Corp., 149 N.H. 371, 378 (2003); see also Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856-57 (1st Cir. 2008); Slater v. Town of Exeter, 2009 WL 737112, at *4 n.5 (D.N.H. March 20, 2009).

#### 1.   Retaliation - Count VII

To state a retaliation claim, "a plaintiff must plead a prima facie case consisting of three elements:  that the plaintiff engaged in an activity that is protected by the statute; that the plaintiff suffered an adverse employment action; and a causal link between the protected activity and the adverse employment action."  Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see also Madeja, 149 N.H. at 378.  If the plaintiff makes a prima facie case, the defendant must "articulate a legitimate, non-retaliatory reason for its conduct."  Perez-Cordero v. Wal-Mart P.R., Inc., --- F.3d ---, 2011 WL 3768739, at *10 (1st Cir. Aug. 26, 2011) (internal quotation marks omitted).  If the defendant provides a reason, the plaintiff must show that the reason provided is a pretext and that the adverse action was taken in retaliation for her protected activity.  Id.

The defendants move to dismiss Hudson's claim on the ground that she has not alleged facts that support a retaliation claim. The defendants contend that the interaction with O'Connell about the complaint filed with the Board of Medicine was not sufficient to support a claim of an adverse employment action. They also contend that O'Connell's threat to fire Hudson in one telephone conversation, following her report to the Human Resources department, was insufficient to support the claim.

As is noted above, Hudson alleges a history of a compelled sexual relationship with O'Connell and multiple threats that she would be fired if she refused to do what O'Connell demanded. After Hudson ended the sexual relationship with O'Connell, she alleges that the Center retaliated against her by making her medical records available to the staff. When she complained to the Human Resources department about the lack of confidentiality, Hudson was referred to O'Connell, and no other response or investigation of her complaint was undertaken. O'Connell threatened to fire her for involving the Human Resources department.

Hudson also alleges that O'Connell accused her of filing a complaint against him, which he acknowledged was true, with the Medical Board. He then demanded that Hudson send a letter to the Medical Board that said the complaint was untrue, or he would

fire her.  Hudson refused to lie to the Medical Board.  In their face to face meeting, O'Connell told Hudson that if she did not send the letter, she would ruin his life and cause 140 employees at the Center to lose their jobs.  Following that confrontation, Hudson left and did not return to work.

In support of their motion, the defendants attempt to isolate the Human Resources incident and the Medical Board complaint incident from the broader context of Hudson's employment experiences.  Even taken separately, it would be difficult to conclude as a matter of law that Hudson's allegations were insufficient to state a retaliation claim.  Taken in the broader context of all of her experiences at the Center, the allegations are sufficient to avoid dismissal.


2.  <u>Quid Pro Quo Harassment – Count VIII</u>

The defendants move to dismiss Hudson's quid pro quo harassment claim on the ground that her allegations are baseless.  The defendants argue that Hudson failed to provide facts to support her claim and instead relied only on conclusory statements.  Hudson points to her allegations about her compelled sexual relationship with O'Connell to support her claim.

In the context of a motion to dismiss, the court takes the plaintiff's factual allegations as true and in the light most

favorable to the plaintiff.  See, e.g., Rederford v. U.S. Airways, Inc., 589 F.3d 30, 34-35 (1st Cir. 2009).  Therefore, absent frivolous or fanciful allegations, a defense that the allegations are "baseless" is inapposite in this context.  See Denton v. Hernandez, 504 U.S. 25, 32-33 (1992); Goldenson v. Steffens, --- F. Supp. 2d ---, 2011 WL 3424246, at *26 (D. Me. Aug. 4, 2011).

Quid pro quo harassment occurs when "an employee or supervisor uses his or her superior position to extract sexual favors from a subordinate employee, and if denied those favors, retaliates by taking action adversely affecting the subordinate's employment."  Valentin-Almeyda v. Municipality of Aquadilla, 447 F.3d 85, 94 (1st Cir. 2006) (internal quotation marks omitted). Contrary to the defendants' characterization of Hudson's complaint, she alleges facts that if taken as true support her claim.  Hudson alleges, among other things, that O'Connell, a fellow employee and a supervisor at the Center, forced her to maintain a sexual relationship with him by threatening to fire her if she refused.  In addition, after the relationship ended, O'Connell would not allow Hudson to work at the Center on Saturdays for extra money as other employees did and instead required her to clean his house and mow his lawn.

Therefore, Hudson alleges a claim for quid pro quo sexual harassment.

### 3.  Hostile Work Environment

A hostile work environment claim has six elements:

(1) that [the plaintiff] is a member of a protected class; (2) that [she] was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment; (5) that the sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and that [she] in fact did perceive it to be so; and (6) that some basis for employer liability has been demonstrated.

Perez-Cordero, 2011 WL 3768739, at *6.  The defendants contend that Hudson's allegations to support her hostile work environment claim are vague and conclusory and do not provide facts to support a sufficiently hostile environment to support the claim.

As is discussed above, Hudson alleges facts about her relationship with O'Connell and treatment at the Center, beginning in late 2008 and ending when she left her job in December of 2010, which provide a picture of harassment and offensive working conditions.  Based on her pleadings, Hudson has alleged sufficient facts to support her hostile work environment claim.

II.  <u>Personal Claims</u>

Hudson alleges claims of battery, negligent infliction of emotional distress, and negligence against O'Connell and claims of invasion of privacy and intentional infliction of emotional distress against O'Connell and the Center.  The defendants move to dismiss all of the state law claims.

A.  <u>Battery - Count II and Negligence - Count X</u>

Hudson alleges that while O'Connell continued a sexual relationship with her, he knew that another woman with whom he was having a sexual relationship had been exposed to herpes. Hudson further alleges that as a result she contracted herpes from O'Connell.  Hudson contends that O'Connell's behavior constitutes battery and negligence.  The defendants move to dismiss the claims, arguing that Hudson failed to state a claim for battery or negligence because she did not allege that O'Connell had herpes or that he knew he had the disease while engaging in a sexual relationship with Hudson.

1.  <u>Battery - Count II</u>

The parties have not cited and the court has not found a New Hampshire Supreme Court case that describes the tort of battery. The First Circuit relied on the definition of battery in the

16

Restatement (Second) of Torts § 13 (1977) for purposes of construing an insurance policy under New Hampshire law: "[A]n actor is liable to another for battery if: (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." United Nat'l Ins. Co. v. Penuche's, Inc., 128 F.3d 28, 32 (1st Cir. 1997).

The New Hampshire Supreme Court also has not addressed battery in the context that is raised in this case, when battery occurs by infecting someone with a sexually transmitted disease. In Welzenbach v. Powers, 139 N.H. 688 (1995), the court denied the plaintiff's claims, including battery, arising from allegations that the defendant had falsely assured the plaintiff that she was taking contraceptive measures during their sexual relationship when she was not, which resulted in the birth of a baby. Id. at 693. In making that determination, the court distinguished cases based on a sexually transmitted disease, stating that the decision did not "address the compelling public policy to halt the spread of sexually transmitted diseases," and cited Kathleen K. v. Robert B., 198 Cal. Rptr. 273, 276 (Cal.Ct.App. 1984) (recognizing a cause of action for negligently or deliberately transmitting venereal disease). The defendants

17

concede that courts have recognized liability under a variety of legal theories for harm caused by infecting another with a sexually transmitted disease.  See McPherson v. McPherson, 712 A.2d 1043, 1046 (Me. 1998); see also Behr v. Raymond, 123 Cal. Rptr. 97, 105 (Cal.Ct.App. 2011); Endres v. Endres, 968 A.2d 336, 340 (Vt. 2008); Hamblen v. Davison, 50 S.W.3d 433, 438 (Tenn.Ct.App. 2000); Deuschle v. Jobe, 30 S.W.3d 215, 218-19 (Mo. App. W.D. 2000).

Battery is an intentional tort.  Thompson v. Forest, 136 N.H. 215, 220 (1992).  To state her claim, Hudson must allege that O'Connell either intended to transmit herpes to her or knew he had herpes so that infecting her was the natural and probable consequence of sexual relations with her.  See Leleux v. United States, 178 F.3d 750, 755 (5th Cir. 1999); Nat'l Union Fire Ins. of Pittsburgh, PA v. Puget Plastics Corp., 735 F. Supp. 2d 650, 659-60 (S.D. Tex. 2010) (discussing Texas state cases differentiating between intentional and negligent torts involving sexually transmitted diseases); Atlin v. Mendes, 2008 WL 3874693, at *2-*3 (N.D. Tex. Aug. 12, 2008); R.W. v. T.F., 528 N.W.2d 869, 872-73 (Minn. 1995); Hogan v. Tavzel, 660 So.2d 350, 353 (Fla. App. 5 Dist. 1995).

Hudson does not allege that O'Connell's sexual partner had herpes, that O'Connell knew that he had contracted herpes, or

18

that he intended to infect Hudson.  See Endres v, Endres, 912 A.2d 975, 976-77 (Vt. 2006) (holding that intent is an element of battery that requires an allegation that defendant knew he was infected).  To state the claim, Hudson must allege intentional actions or knowledge of the infection and probable consequences, which are lacking here.  Therefore, the battery claim is dismissed.

    2.  Negligence - Count X

Hudson also alleges that O'Connell negligently infected her with herpes.  For purposes of negligent transmission of a disease, one who is infected with a communicable disease owes a duty not to infect others.  Endres v. Endres, 968 A.2d 336, 340 (Vt. 2008).  "In recognizing the duty not to transmit an STD to a sexual partner, courts require persons to exercise ordinary care to avoid transmission.  To establish an actionable breach of that standard of care, the plaintiff must show that the defendant had actual or constructive knowledge that he or she was infected with the transmitted STD."  Id.  Constructive knowledge is based on circumstances under which the person should have known there was a reasonable probability that he was infected.  Id. at 342; see also Rossiter v. Evans, 2009 WL 5125922, at *3 (Iowa App. Dec. 30, 2009); Cardella v. Cardella, 2008 WL 4367306, at *2-*3

(Tenn.Ct.App. Sept. 17, 2008); <u>John B. v. Superior Court</u>, 137
P.3d 153, 160 (Cal. 2006).

Here, Hudson alleges that O'Connell knew that his other
sexual partner's husband had been diagnosed with a severe case of
herpes.  Absent contrary information, an inference can be drawn
that O'Connell would be aware of the risk that his sexual partner
was infected with herpes, raising an issue as to whether a
reasonable person would have suspected that he would be infected.
Hudson also alleges that she became infected with herpes during
her sexual relationship with O'Connell, when she was not having a
sexual relationship with anyone else, which supports an inference
that O'Connell contracted herpes and infected Hudson.  Taking
Hudson's allegations in the light most favorable to her with
reasonable inferences drawn in her favor, she has alleged enough
to state a claim of negligence.


    B.  <u>Invasion of Privacy - Count III</u>

Under New Hampshire law, four distinct torts are encompassed
within the theory of invasion of the right of privacy.  <u>Lovejoy</u>
<u>v. Linehan</u>, 161 N.H. 483, 485 (2011).  Hudson is proceeding under
the tort of public disclosure of private facts against both the
Center and O'Connell.  The defendants move to dismiss the claim
on the grounds that Hudson has not alleged that either the Center

or O'Connell publicly disclosed private facts and that the
Workers' Compensation laws bar employees from bringing
intentional tort claims against their employers.

1.   <u>Workers' Compensation Law Exclusivity Provision</u>

Relying on <u>Karch v. BayBank FSB</u>, 147 N.H. 525, 530-31
(2002), the Center argues that Hudson's invasion of privacy claim
against it is barred by the Workers' Compensation Law's
exclusivity provision.  RSA 281-A:8,I(a) provides that employees
of employers covered by the Workers' Compensation Law are
presumed to have waived all rights of action against her
employers for actions or circumstances that occurred during
employment.[3]  <u>Karch</u>, 147 N.H. at 530-31.  The Workers'
Compensation Law covers certain injuries that "arise out of and
in the course of employment."  RSA 281-A:2, XI.

Before the amendment of RSA 281-A:2, XI in 2001, the New
Hampshire Supreme Court included claims based on intentional
actions with unexpected consequences within the coverage of the
Workers' Compensation Act.  <u>Karch</u>, 147 N.H. at 530-31.  The 2001
amendment, however, added the following sentence:  "'Injury' or
'personal injury' shall not include mental injury if it results

---

[3]Hudson does not suggest that the Center was not covered by
the Workers' Compensation Act.

21

from any disciplinary action, work evaluation, job transfer,
layoff, demotion, termination, or any similar action, taken in
good faith by an employer." RSA 281-A:2, XI. The court in Karch
stated that "the recent amendment, see RSA 281-A:2, XI (Supp.
2001), may yield a different result" but declined to apply the
amendment retroactively. Karch, 147 N.H. at 530.

The parties have not cited and the court has not found a
case that addresses the effect of the amendment of RSA 281-A:2,
XI on claims for mental injury against an employer. Because the
parties have not addressed the effect of the amendment on
Hudson's claims, the court cannot determine for purposes of the
motion to dismiss whether Hudson's invasion of privacy claim is
barred by RSA 281-A:8, I(a).


   2.  Merits

To state a claim of public disclosure of private facts, a
plaintiff must allege that the defendants disclosed something
that "would be highly offensive to a reasonable person" and that
"is not of legitimate concern to the public." Lovejoy, 161 N.H.
at 486 (internal quotation marks omitted). In addition, the
defendants must have made the private facts public "by
communicating [the facts] to the public at large, or to so many
persons that the matter must be regarded as substantially certain

22

to become one of public knowledge." <u>Karch</u>, 147 N.H. at 535
(internal quotation marks omitted). Allegations that the
defendant communicated private facts in the work place to other
employees are sufficient to state the claim. <u>Id.</u>

Hudson alleges that the Center and O'Connell failed to keep
her computerized medical information confidential so that
employees at the Center learned of her herpes infection. The
defendants do not dispute that Hudson's medical information meets
the standard for private facts. They argue that her allegations
that they failed to protect her confidential information do not
allege that they publicized the information as is required to
state the claim.

In <u>Yath v. Fairview Clinics, N.P.</u>, 767 N.W. 2d 34, 42-43
(Minn. App. 2009), the court considered whether a temporary
posting of medical information that the plaintiff had a sexually
transmitted disease on a MySpace webpage constituted public
disclosure for purposes of an invasion of privacy claim. The
court concluded that even a short-term posting on MySpace was
publicity because the website was not private and was accessible
by the public. <u>Id.</u> The court distinguished the circumstances in
<u>Bodah v. Lakeville Motor Express, Inc.</u>, 663 N.W.2d 550 (Minn.
2003), where the defendant employer sent private employee
information by facsimile to sixteen managers within the company,

because there the information was not likely to become public. Yath, 767 N.W.2d at 43.  In Pachowitz v. Ledoux, 666 N.W.2d 88, 95-96 (Wis. App. 2003), the court examined the cases pertaining to publicity in the context of invasion of privacy and decided that when the plaintiff had a special relationship with those to whom the private information was disclosed, disclosure to even a single person or a small number may constitute publicity.  The defendants acknowledge that in Karraker v. Rent-A-Center, Inc., 239 F. Supp. 2d 828, 838-39 (C.D. Ill. 2003), the court held that the plaintiff stated an invasion of privacy claim where the defendant put test results in a personnel file that was available to managers and could be disclosed to anyone.

The defendants cite Brown v. Wabash Nat'l Corp., 293 F. Supp. 2d 903, 905 (N.D. Ind. 2003), for the proposition that making private information available on a shared workplace network is not actionable as invasion of privacy.  In Brown, however, the court first held that a claim for invasion of privacy by publicizing private facts was contrary to the Indiana constitution.  Id.  Alternatively, the court stated that because the plaintiff alleged that the employer put the information on the shared network to comply with the plaintiff's request, the plaintiff failed to state an invasion of privacy claim.  Id.

Hudson alleges that O'Connell and the Center are liable for invasion of privacy because they failed to protect the confidentiality of her medical records.  As a result, her private medical information was available to her fellow employees who learned about her herpes infection and talked about it at work. Although it remains unclear how many people had access to Hudson's medical records and how many learned of her herpes infection, given the standard for a motion to dismiss, invasion of privacy is alleged sufficiently to avoid dismissal.

C.   Intentional and Negligent Infliction of Emotional Distress – Counts IV and V

The defendants move to dismiss Hudson's intentional infliction of emotional distress claims on the grounds that Hudson's allegations are too conclusory to state a claim and that the claim against the Center is barred by RSA 281-A:8, I. O'Connell moves to dismiss the negligent infliction of emotional distress claim against him because Hudson failed to allege an essential element of the claim, physical manifestation.

1.   Workers' Compensation Law

The Center raises the exclusivity provision of the Workers' Compensation Law to dismiss Hudson's intentional infliction of

emotional distress claim against it.  As is discussed in the
context of the invasion of privacy claim, the parties have not
addressed the amended version of RSA 281-A, XI.  In the absence
of a reasoned analysis of the application of the exclusivity
provision under the current law, the Center has not demonstrated
that the Workers' Compensation Law bars Hudson's claim.

### 2. Intentional Infliction of Emotional Distress

"One who by extreme and outrageous conduct intentionally or
recklessly causes severe emotional distress to another is subject
to liability for such emotional distress, and if bodily harm to
the other results from it, for such bodily harm."  Mikell v.
School Admin. Unit No. 33, 158 N.H. 723, 728 (2009).  Extreme and
outrageous conduct to be actionable must "'go beyond all possible
bounds of decency, and to be regarded as atrocious, and utterly
intolerable in a civilized community.'"  Id. at 729 (quoting
Restatement (Second) of Torts § 46, comment d at 73).  The
extreme and outrageous character of conduct may arise from the
abuse of a position of authority.  Mikell, 158 N.H. at 729.

The defendants are correct that Hudson provides only
conclusory allegations in Count IV, the intentional infliction of
emotional distress claim.  However, she incorporates her prior
allegations into her intentional infliction of emotional distress

claim.  When all of her allegations are considered in the light most favorable to her with reasonable inferences taken to support her claim, the claim is sufficiently plausible to avoid dismissal at this early stage.

      3.  <u>Negligent Infliction of Emotional Distress</u>

To recover for negligently inflicted emotional distress, a plaintiff must prove physical manifestations of the distress. <u>O'Donnell v. HCA Health Servs. of N.H., Inc.</u>, 152 N.H. 608, 611 (2005).  Hudson alleges that she suffered "severe physical and emotional distress" but does not provide any detail as to what physical symptoms were caused by the negligent infliction of emotional distress.  Even taking the allegations in the light most favorable to her, Hudson's conclusory statement that she suffered physical distress does not provide a factual basis for her claim.  Therefore, an essential element of the claim is missing, and it is dismissed.

<u>Conclusion</u>

For the foregoing reasons, the defendants' motion to dismiss (document no. 13) is granted as to Count II (battery), Count V (negligent infliction of emotional distress), and Count VI (sexual harassment) and is otherwise denied.


SO ORDERED.


_____
Joseph A. DiClerico, Jr.
United States District Judge

October 4, 2011

cc:  William E. Christie, Esquire
     John P. Sherman, Esquire

28